OPINION OF THE COURT
William M. Erlbaum, J.
*1040 The defendant, Corey Brown, is charged under indictment number 1637/1999 with attempted murder in the second degree, robbery in the first degree, and related charges. On December 12, 2005, the defendant was found not fit to proceed to trial pursuant to article 730 of the Criminal Procedure Law. On December 16, 2005, the defendant was admitted to Mid-Hudson Forensic Psychiatric Center “for psychiatric treatment to restore his competence to stand trial” (see, Mid-Hudson Forensic Psychiatric Center report, Jan. 25, 2006, at 1). On January 25, 2006, the defendant was found by the staff at Mid-Hudson to have a “sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and ... a rational as well as factual understanding of the proceedings against him” (see, id.).
The People accepted the findings of Mid-Hudson that the defendant is now fit to proceed to trial; the defense did not, and moved for the CPL article 730 hearing held herein. Accordingly, pursuant to Criminal Procedure Law article 730, a hearing was held before this court, on May 15, 2006, December 7, 2006, February 1, 2007, and March 20, 2007, so that a determination could be made as to the defendant’s competency to stand trial. At the hearing, the People called Dr. Kajal Saha and the defendant called Dr. Arnold Eggers. The court finds both witnesses to be credible.
Dr. Saha testified that he is a psychiatrist at the Mid-Hudson Forensic Psychiatric Center. He endeavors, along with a treatment team, to restore individuals, who are not fit for trial, to competence. Dr. Saha initially stated that an individual can be mentally ill and still have the capacity to understand the criminal charges that are pending against him. He testified that he examined the defendant while he was a patient at Mid-Hudson, and was his doctor from December 16, 2005 until February 17, 2006. Dr. Saha indicated that he had the opportunity to review the defendant’s prior medical history, and is aware of the fact that the defendant, in the past, had been shot in the head, in the left parietal-occipital area.[1] Dr. Saha testified that the defendant therefore suffers from seizures, mixed aphasia, and hemipa *1041 resis on the right side.[2] Dr. Saha testified that he was able to determine, during his examination of the defendant, that the defendant was able to perceive things, and recall and relate with regard to conversations with the doctor, and that while in the hospital, the defendant played cards, watched television, played chess, and even identified the pieces and critiqued the movements of the game of chess. Dr. Saha continued that though the defendant understands the role of the judge and defense counsel, sometimes during examinations the defendant chose not to answer certain questions. Dr. Saha indicated that the defendant could answer those questions, and could cooperate if he chose to do so. He further testified that the defendant is able to express his needs and his wants, by nodding his head, verbalizing a few words, and making gestures. Furthermore, Dr. Saha stated that the defendant understands what he is doing when he expresses himself. Dr. Saha testified that the defendant has a good memory, is alert and oriented, knows who he spends his time with, and was mostly calm and cooperative with staff members.
Five days after the defendant’s admission to Mid-Hudson, he became upset about property that he had left on Bikers Island, and he verbally demanded it immediately. The staff told the defendant they would try to get it for him, but the defendant was very upset and needed to be manually restrained for a short time. He was offered psychotrophic medication, but refused it as not needed. Dr. Saha testified that the defendant is currently taking anti-seizure medication, needed due to the gunshot wound to his head. Dr. Saha also testified that this incident demonstrated that the defendant has good memory.
When asked by the court to explain the term “elective mutism,” referred to in Dr. Saha’s report dated January 25, 2006 (at 3), the doctor explained that a person exhibits elective mutism when they choose to answer certain things and choose not to answer other things. Dr. Saha continued that the defendant can talk, and sometimes chooses not to talk, and sometimes he chooses not to talk when that is in his best interest. Dr. Saha stated that when the defendant wants something, his property from Bikers Island, a deck of cards, he is able to express himself. Furthermore, he can express himself regarding the role of judge and district attorney, but he did not answer questions regarding *1042 the function of a jury, and whether he would cooperate with defense counsel. Dr. Saha indicated that though the defendant understood those questions, he did not want to answer them. Dr. Saha stated that the defendant could speak to, and form a working relationship with, his attorney if he so desired, as he did with staff members and his peers at the hospital. Dr. Saha testified that the defendant is capable of understanding his attorney, participating in his own defense, and is able to accept or reject his attorney’s advice.
Dr. Saha testified that he was aware that the defendant has been examined several times in the past, and upon review of the defendant’s preceding CPL article 730 reports, he found that the defendant has previously been found both fit to proceed, and not fit to proceed. Dr. Saha testified that he reviewed a report dated August 30, 2002, written by Dr. Weidenbacher wherein Dr. Weidenbacher stated that he was “persuaded that [the defendant] feigns or exaggerates disability,” and that Dr. Weidenbacher recommended a period of observation where he thought it would be “likely that sustained observation will clarify matters further and also prove instructive to the defendant.” Dr. Saha also reviewed another report by Dr. Weidenbacher, dated October 15, 2005, wherein Dr. Weidenbacher stated, “I believe he probably understood our request that he answer questions and converse with us but he said not a word. I sense strongly that he chooses not to speak with us.” Dr. Saha also read a report of Dr. Owen, dated October 21, 2000, wherein she stated “[the defendant’s] capabilities are well within his conscious control.” Dr. Saha also stated that he examined a report of Dr. Kerner, dated August 30, 2002, wherein she stated (at 1) that “[i]t is likely that [the defendant] is exaggerating his impairment and that his presentation is disingenuous.” Furthermore, Dr. Saha testified that he studied a neurological evaluation of the defendant performed in 2003. Though the doctor did not state who performed the evaluation or where it was conducted, he explained that the report found that the defendant was able to communicate with verbal and nonverbal cues, expressed an interest in teaching chess and card games to the examiner, and understood what was being said to him, and, though he did not speak normally, was able to express himself. Dr. Saha considered all of these reports when observing the defendant at Mid-Hudson and continued his testimony by stating that he concurs with these conclusions and is also of the opinion that the defendant exaggerates his disability.
*1043 Dr. Saha concluded his direct testimony by stating that he is of the opinion that even though the defendant has a disability, he would still be able to help his attorney formulate a defense if he so chose, and he is able to understand the charges against him.
On cross-examination, Dr. Saha testified that in the report by Dr. Weidenbacher dated October 18, 2005, and in a report by Dr. Owen, dated October 21, 2000, the defendant was found by both doctors to be not fit to proceed to trial. Dr. Saha continued that the defendant was also found not fit to proceed in other reports as well. When questioned about the neurological findings of Dr. Eggers who found in 2003 that the defendant had no way to exchange ideas or information, Dr. Saha testified that the report also stated that the defendant understands a significant amount of what is said to him. Dr. Saha acknowledged that though this report also states that it is difficult to determine when the defendant understands something, Dr. Saha testified that the defendant was observed day by day and he was able to comprehend card games, and is still functional.
Dr. Saha testified that the defendant does not talk normally due to mixed aphasia, expressive and receptive. He has difficulty understanding some words and expressing others. The defendant can speak two or three words and then must pause, but can still make someone understand him. Dr. Saha stated he believes that the defendant can give a fuller account of something to his lawyer or doctor, and that his failure to do so is elective. He stated that at the hospital the defendant was cooperative, coherent, oriented, and knew which staffer he was communicating with. Dr. Saha also conceded that he was aware of a report by a Dr. Slyker (no date stated) who said that there was no way to show that the defendant could communicate with his attorney about his defense. Dr. Saha continued that he did not see the defendant write any letters, and that he points, nods, and shrugs his shoulders to communicate.
Dr. Saha also testified that he agreed with a report by a Dr. Horn, dated July 2001, stating, “the inconsistencies seen from one session to the next indicate that [the defendant] has a fair amount of control over his aphasic symptoms. Although he may have some deficits, this behavior suggests some degree of dissimulation and exaggeration.” However, Dr. Saha stated that he also agreed with a 2002 report of Dr. Weidenbacher finding that the “ability to assist in his defense could not be inferred from the exaggeration.” Dr. Saha continued that the defendant *1044 answered certain questions, but not others, regarding the trial process. The defendant was able to use words to answer certain questions. Dr. Saha testified that though the defendant is in wheelchair, he was able to get up on one occasion, and he is able to care for himself, to keep himself neat and clean.
Dr. Saha continued his testimony by stating that he believes that the defendant is fit to proceed and can assist his attorney. Dr. Saha stated that the defendant has been found fit to proceed in 2001 by Dr. Horn, not fit to proceed in the past by Drs. Weidenbacher, Owen, O’Rourke, and Kerner, and that those doctors wanted the defendant to be closely observed. Dr. Saha further commented that though the defendant did not answer all of the questions posed to him regarding court functions he answered many and those answers were relevant and coherent. Furthermore, he stated that the defendant has good memory.
Dr. Arnold Eggers, an associate professor of neurology at SUNY Downstate and an attending physician at Kings County Hospital, called on behalf of the defendant, testified that he examined the defendant in 2003 while the defendant was a psychiatric patient at Kings County Hospital. Dr. Eggers provided a neurology consult of the defendant upon request of the psychiatry service. Dr. Eggers testified that the defendant has nonfluent speech, which means the defendant has difficulty finding words while trying to express himself, that he is impaired at using grammar and vocabulary, and that when trying to have a conversation, the defendant cannot say more than a word or two. Dr. Eggers continued his testimony by stating that during his examination of the defendant, the defendant was able to name common objects, such as a pen or watch, but could not name more complicated objects, such as items of clothing. When asked by the court if the defendant could not do better, or was electing not to do better on the exam, Dr. Eggers stated that he drew the inference that the defendant could not do better because the defendant behaved as a typical aphasic. Furthermore, Dr. Eggers testified that the CAT scan of the defendant’s brain showed injury in the areas which control language skills, and had he reviewed the CAT scan before he examined the defendant, he would have predicted the same kind of aphasia exhibited by the defendant.
Dr. Eggers continued that the part of the defendant’s brain that is damaged would not regenerate itself. Dr. Eggers stated that he examined the defendant in 2003, four years after his initial injury. Dr. Eggers stated that when reviewing the *1045 defendant’s CAT scan it is hard to predict how severe the damage is, though there was no doubt in his mind that the defendant is aphasic. However, Dr. Eggers noted that he thought the defendant would be more aphasic than he is.
Dr. Eggers explained that aphasia is loss of language, and the defendant has suffered a loss of comprehension and expression. The defendant also suffers paralysis on the right side of his body, also due to the gunshot wound to his head. Dr. Eggers continued that the language deficit the defendant is suffering from is severe, as he has no useful language, though the defendant can express his choices in other ways, and does know some words. However, he cannot hold a conversation. The defendant is completely normal in terms of emotions, and he can change a TV channel, or want to have it changed.
Dr. Eggers testified that elective mutism is when an individual chooses to remain silent. He stated that the defendant was not mute with him, that the defendant tried to speak with him and when he was able did so in a soft tone of voice, with slurred speech. Dr. Eggers testified that he did not believe the defendant was faking his inability to communicate, and that his exam was characteristic of people with aphasia. Dr. Eggers continued that the defendant would be unable to discuss with his attorney the facts regarding his prior criminal record, whether he should have a jury trial, the facts that led up to his injury, or whether he should testify. Furthermore, Dr. Eggers indicated that the defendant would be unable to testify before a jury at trial, that he would be unable to converse with anyone regarding the suffering of his injury, that he will never recover, and that he is permanently disabled.
Dr. Eggers noted that it is possible that the defendant might be able to play board games, since the part of the defendant’s brain that was not injured controls that activity.
Dr. Eggers stated that if the defendant had no paralysis, a person with his injury, though he probably could not live alone, could go about normal daily functions such as getting dressed, using the restroom, and eating by himself. However, he still would be unable to effectively communicate.
On cross-examination, Dr. Eggers testified that he has treated very few patients with gunshot wounds to the head, and has never participated in the preparation of a psychiatric defense. Dr. Eggers commented that he believed the defendant not to be a malingerer, but that it would be possible for someone to know how to convince an examiner that he had an aphasic condition *1046 if he had. been evaluated enough times and knew how to answer questions. Dr. Eggers also added that the defendant exhibited some subtle features of an aphasic patient that a layperson would not know how to fake.
Dr. Eggers testified that the defendant could only put one or two words together. When asked by the People about a 2005 report by a neuropsychologist named Dr. Berrill, wherein Dr. Berrill stated that the defendant used a large number of words when talking, Dr. Eggers indicated that he found that to be surprising but it could possibly change his opinion of the defendant. Dr. Eggers continued that the defendant is able to respond to certain questions, that it is difficult to enter the mind of an aphasic person, and that though the defendant may know that he is in court relating to charges that have been brought against him, he doubts that the defendant would actually understand what was happening. Dr. Eggers stated that he took the situation at face value, that the defendant is an aphasic patient.
Dr. Eggers testified that it is possible that the defendant would be able to tell a doctor how long he had been incarcerated and that he knew how long he had been in jail. Dr. Eggers continued that he is not surprised that the defendant told another doctor that he had been incarcerated for approximately eight years. Dr. Eggers also conceded that it is possible that the defendant is exaggerating his illness, in that it is possible that he could be more forthcoming with other doctors than he was with Dr. Eggers. Dr. Eggers made this concession when informed of reports of other doctors stating that the defendant was more verbal with them and had provided more details regarding his condition and situation.[3] Dr. Eggers testified that he was unaware of reports from Mid-Hudson expressing the thoughts of one or more staff members that the defendant was malingering, and Dr. Eggers continued that he was surprised that another doctor did find him to be malingering. Dr. Eggers stated that he did not draw a conclusion that the defendant was not completely forthcoming with him during his examination.
Dr. Eggers testified that he believes the defendant is able to withstand the stresses of trial, that he understands he is on trial, and that he could respond to a simple question, though Dr. Eggers said he would be concerned if the defendant was *1047 responding to the question or a misapprehended question. With regard to the fact that the People informed Dr. Eggers that the defendant was able to speak longer phrases with another doctor, Dr. Eggers stated that though he cannot explain it, the defendant may have been having a good day, or may have been exhibiting elective mutism.
Dr. Eggers testified that his exposure to the defendant was limited to one interview, lasting a half hour, in 2003. He stated that with more time to observe the defendant, a more informed opinion as to his condition could be rendered.
On redirect examination, Dr. Eggers testified that he does not know Dr. Berrill, and that his findings are consistent with Dr. Saha’s statement that the defendant speaks two or three words in a sentence. Dr. Eggers continued that an important way to evaluate patients is by observing them in a social setting. Dr. Eggers stated that, without seeing all of Dr. Berrill’s evaluation, his opinion of the defendant’s condition does not change by being informed that the defendant spoke longer sentences to Dr. Berrill.
Dr. Eggers testified that he has dealt with dozens of patients with aphasia, and it is not unusual for them to watch television, or to watch and enjoy a sporting event, but they could not have an in-depth conversation about it. Though Dr. Eggers stated that the defendant would not deteriorate during a trial, he does not think that the defendant could follow a trial, to comprehend what a witness was saying, or to give feedback to his attorney. Dr. Eggers also stated that due to the defendant’s language deficiency, it would not surprise him if the defendant gave incorrect answers to questions.
On re-cross-examination Dr. Eggers testified that he disagreed with Dr. Saha’s opinion that the defendant could give a fuller account of something to his lawyer or doctor, in more than two or three words.
Conclusions of Law
The sole issue before the court is whether or not the defendant is fit to proceed to trial. In People v Mendez (1 NY3d 15 [2003]), the Court of Appeals held that the test for competence is set forth in CPL 730.10 (1), which provides that an “incapacitated person” is defined as “a defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense.” The Court further held that “[f]or purposes of due process, the *1048 United States Supreme Court has explained that the defendant must have ‘sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and ... a rational as well as factual understanding of the proceedings against him’ ” (id. at 19, quoting Dusky v United States, 362 US 402, 402 [1960]). Factors to be considered in determining competence include whether the defendant:
“(1) is oriented as to time and place; (2) is able to perceive, recall and relate; (3) has an understanding of the process of the trial and the roles of Judge, jury, prosecutor and defense attorney; (4) can establish a working relationship with his attorney; (5) has sufficient intelligence and judgment to listen to the advice of counsel and, based on that advice, appreciate (without necessarily adopting) the fact that one course of conduct may be more beneficial to him then another; (6) is sufficiently stable to enable him to withstand the stresses of the trial without suffering a serious or prolonged or permanent breakdown” (see, People v Picozzi, 106 AD2d 413, 414 [2d Dept 1984]; see also, People v Valentino, 78 Misc 2d 678 [1974]).
Finally, the Mendez court found that the burden of proof with respect to this issue is on the prosecution to establish the defendant’s competence “by a preponderance of the evidence” (1 NY3d at 19; see also, People v Troy, 28 AD3d 689 [2d Dept 2006], lv denied 7 NY3d 852 [2006]).
In the opinion of the court, the People have met their burden of showing the defendant’s competence as that term is described in the Criminal Procedure Law. Although the court was presented with conflicting testimony, it finds the testimony of Dr. Saha to be more persuasive than that of Dr. Eggers (see, People v Wood, 251 AD2d 521 [2d Dept 1998], lv denied 92 NY2d 1041 [1998] [which held that the hearing court is entitled to credit the testimony of the People’s expert over that of the defense]). Dr. Saha testified that the defendant is alert and oriented; that he can perceive, recall, and relate; that he understands the roles of those involved in the trial process; that the defendant could, if he wished, establish a working relationship with his attorney, participate in his defense, and accept or reject his attorney’s advice; and that the defendant can withstand the stresses of trial. Finally, Dr. Saha testified that the defendant is competent to stand trial.
In contrast to Dr. Saha’s testimony, Dr. Eggers testified that the defendant is not competent to stand trial. While the court *1049 certainly is impressed with the credentials of Dr. Eggers, the court is not swayed by his opinion. Dr. Eggers examined the defendant on only one occasion, in an interview that lasted only half an hour, approximately four years ago. Dr. Eggers did not have the opportunity, as Dr. Saha and his hospital staff did, to observe, first hand, the defendant and his interactions with others, staff members and patients alike, over a period of time. Instead, the opinions of Dr. Eggers are based upon a short period of time spent with the defendant and Dr. Eggers’ understanding of how aphasia affects patients generally. Dr. Saha had the benefit of observing the defendant while he was a patient at a hospital where the people on his treatment team, as well as other hospital staff, observed the defendant and reported back to Dr. Saha.
Furthermore, Dr. Eggers conceded that it is possible that the defendant is exaggerating his illness. He also admitted that if he had more time to observe the defendant, he might have been able to express a more informed opinion, and that an important part of an evaluation is to observe a defendant in a social setting. Dr. Saha had the benefit of these more detailed and involved observations of the defendant. Dr. Eggers also admitted that the defendant is able to express his choices. Additionally, the court notes that despite Dr. Eggers’ opinion that the defendant’s condition would never improve, and the court is not discounting that very strong possibility, his examination of the defendant was conducted before the defendant was admitted to Mid-Hudson and returned to the court as fit to proceed.
In the opinion of the court, there are few specific and unequivocal indications cited by Dr. Eggers that are compelling enough to override the opinion of Dr. Saha that the defendant is competent. Accordingly, the court finds the defendant fit to proceed to trial.
The court notes, in finding that the defendant has the capacity to be tried, that it is not suggesting that the defendant is not in any way mentally impaired. The court is sympathetic as to the defendant’s condition.[4] However, it is settled law that a de *1050 fendant may be suffering from psychiatric problems, but is nevertheless not necessarily also incapacitated under article 730. (See, People v Phillips, Sup Ct, NY County, Aug. 17, 2006, Kahn, J., Indictment No. 5187/2004; People v Francabandera, 33 NY2d 429 [1974]; see also, an interesting case from Illinois, People ex rel Myers v Briggs, 46 Ill 2d 281, 263 NE2d 109 [1970] [defendant an illiterate deaf mute]; see also, People v Ciborowski, 302 AD2d 620 [3d Dept 2003], lv denied 100 NY2d 579 [2003]; People v Shiffer, 256 AD2d 818 [3d Dept 1998], lv denied 93 NY2d 878 [1999]; People v Harris, 109 AD2d 351 [2d Dept 1985]; People v Surdis, 23 AD3d 841 [3d Dept 2005]; People v Stonis, 246 AD2d 911 [3d Dept 1998], lv denied 92 NY2d 883 [1998].)
Based upon the foregoing, the defendant’s application for an order finding him to be an incapacitated person pursuant to CPL article 730 is denied.

. The defendant sustained a gunshot wound to the head on the date that he allegedly committed the crime that is the subject of the instant indictment. Apparently, the defendant was shot by a police officer who was pursuing him.

. In a report dated October 21, 2005 (at 3), Dr. Elizabeth Owen describes aphasia as a partial loss of ability to use language as a result of brain damage, and hemiparesis as partial paralysis.

. The People were referring to Dr. Berrill’s report wherein it was stated that the defendant informed the doctor that the defendant had been incarcerated for eight years for a robbery, and was shot in the head by the police.

. Based upon the fact that the defendant is clearly suffering from some impairment due to the gunshot wound he sustained in the head, the court will entertain any reasonable and appropriate application raised by either the People or the defendant for trial accommodations, such as those discussed by Justice Kahn in her decisions regarding People v Phillips (Sup Ct, NY County, Aug. 17, 2006, Indictment No. 5187/2004 [decision on motion pursuant to *1050 CPL article 730]; Aug. 25, 2006 [order on trial accommodations]; 14 Misc 3d 1221[A], 2007 NY Slip Op 50119[U] [2007] [decision on Wilson/Francabandera motion]).